UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Franklin Parker,

      Plaintiff,

v.                                                                      Case No.: 14-11067

Ryan Spangler, et al.,                                    Honorable Sean F. Cox

      Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. #19)**

This is a § 1983 case. Plaintiff Franklin Parker ("Plaintiff") alleges that Wayne State University ("Wayne State") Public Safety officers Ryan Spangler ("Spangler"), Michael Jacobs ("Jacobs"), Patrick Hammill ("Hammill"), David Mahood ("Mahood"), and Shannon Thomas ("Thomas"), along with the Director of Wayne State's Mort Harris Recreation Facility ("WSU Gym"), Chris Nolan ("Nolan") (collectively, "Defendants"), violated his Fourth Amendment rights in connection with his alleged arrest at WSU Gym on December 2, 2010. Plaintiff also alleges state law claims for assault and battery, false arrest/false imprisonment, and gross negligence.

This matter is before the Court on Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. #19). The motion has been fully briefed by the parties. For the reasons set forth below, the Court shall GRANT IN PART and DENY IN PART Defendants' motion.

# BACKGROUND

## I.      Procedural History

Plaintiff filed this suit on November 26, 2013 in Wayne County Circuit Court.  (Notice of

Removal, Doc. #1).  Plaintiff later filed an Amended Complaint in the state court.  (Doc. #1).

In the Amended Complaint, Plaintiff alleges five causes of action against all Defendants, in

their official and individual capacities:

| | |
|---|---|
| Count I: | Violation of the Fourth Amendment 42 U.S.C. § 1983 Excessive Force; |
| Count II: | Assault and Battery; |
| Count III: | False Arrest/False Imprisonment; |
| Count IV: | Violation of the Fourth Amendment 42 U.S.C. § 1983—Illegal Search and Seizure as to Plaintiff Franklin Parker; and |
| Count V: | Gross Negligence. |

(Doc. #1 at pp. 38–46).

On March 12, 2014, Defendants removed the case to this Court on the basis of federal

question jurisdiction.  Discovery closed on February 6, 2015.  (2nd Scheduling Order, Doc. #10).

On March 9, 2015, Defendants filed their joint Motion for Summary Judgment.  (Defs.' Mo.,

Doc. #19).  Plaintiff responded, (Pl. Resp., Doc. #27), and Defendants replied.  (Defs.' Reply, Doc.

#29).[1]

## II.     Factual Background

Most of the facts underlying this case are disputed.

---

[1] Plaintiff also filed a supplemental brief providing the Court with an affidavit from
expert W. Ken Katsaris.  (Doc. #32).

In the fall of 2010, Plaintiff was a student at Wayne State in Detroit, Michigan.  At that time, Plaintiff was approximately 51 years old.  Plaintiff was in the U.S. Army from 1979 to 1987, and began attending Wayne State in 2008.  (Pl. Dep., attached to Pl. Resp. at Ex. A, at p. 35).

Plaintiff testified that he would "occasionally" use the WSU Gym on Wayne State's campus. Plaintiff claims that he is a trained kickboxer, and was once ranked number three in the world for kickboxing.  (Pl. Dep. at 15).  Plaintiff testified that he has been "teaching martial arts all [his] life." (Pl. Dep. at 16).

**A)   Plaintiff's Version of Events on December 2, 2010**

**1)   Plaintiff's Testimony**

Plaintiff testified that he went to the WSU Gym on December 2, 2010, arriving at approximately 4:30 p.m.  (Pl. Dep. at p. 42–43).  When he first arrived, he "walked in the WSU Gym and . . . met Shila Wu . . . ."  (Pl. Dep. at 43).  Plaintiff testified that Shila Wu ("Wu") was a trainer at the WSU Gym, and that they had become friends.  (Pl. Dep. at 41).  Plaintiff testified that Wu wanted to work out with him on that day:

> Q:   Did you and Shila intend to – did Shila want you to help her or want to work with you?
>
> A:   Yes.
>
> Q:   In what regard?
>
> A:   Over a year she had asked me to teach her how to complete her boxing cycle because she just knew one, two and she wanted me to take her to six.  I told her I would do it, but I was always sick and I couldn't come.  So when I came on Tuesday, I told her I would start with her.  We started on Tuesday and we got to four.  I told her when I came back on Thursday, I would take her to five and six boxing numbers.  So she met me at the door and we started talking. She introduced me to the guys and I had my computer, I said I'm going to put my computer in the locker.  And she said, Frank, don't put your computer in

3

the locker, I'll put in the office. I said, no, I'll put it in a locker, don't be bothered with it. She was so adamant about putting my computer in the office, I just let her take it.

(Pl. Dep. at 43–44). Plaintiff testified that, when Wu walked away to put his computer in her office,

A:      . . . there was a girl that asked me if we're working out today. She's like are you guys still going to work out, could I work out with you today. I said we're just going to be here a few minutes, I'm going up on the third floor with Shila. I said if you want, she can teach you cardio kick, and she said okay. And her friend was standing next to her and I said your friend can come up as well. I said come up in about 15 minutes, we'll be done, 10, 15 minutes and we'll be done. She said, okay. We proceeded to go up on the third floor at that point.

Q:      So the first female, not Shila, but the first female initiated conversation with you?

A:      Yes, she always speaks to me at the gym. She always speaks, yes.

Q:      What was her name?

A:      I have no idea.

(Pl. Dep. at 44). Plaintiff testified that after Wu placed his laptop bag in her office, he and Wu "went and caught the elevator and went up to the third floor and she and I proceeded for me to continue with that boxing routine I was showing her on Tuesday . . ." (Pl. Dep. at 46–47).

Plaintiff claims that he and Wu "started and maybe two, three minutes we got into it and maybe a few minutes later the police walked up to me and they said are you Frank Parker, and I said yes. They said you are under arrest." (Pl. Dep. at 47). Plaintiff testified that "[a]bout six police officers" had approached him. (Pl. Dep. at 49). Plaintiff claims that

the main two officers walked up to me and the rest of them was just standing in the background. And they said . . . you are under arrest. I said under arrest for what. They said it doesn't matter, you are under arrest.
        At that point they started going through my pockets and taking everything out and I didn't say anything at that point. I just won't say anything and when somebody

4

say you are under arrest and it doesn't matter, I didn't say anything.  I just let everything unfold.  I didn't know they were going to try to hurt me.

(Pl. Dep. at 50).  Plaintiff testified that "they handcuffed [him] and went through [his] pockets." (Pl.

Dep. at 51).  Plaintiff claims that two of the officers were trying to hurt him:

> Q:    And there were two – you said two main officers and the rest were standing behind –
>
> A:    The two trying to hurt me, they were like pulling me back and forth and saying you think you are a tough guy and I didn't understand any of that.
>
> Q:    Which two officers were those?
>
> A:    I think Ryan Spangler and I don't know the other guy's name.  It was the two tallest guys and one of them was really strong.
>
> Q:    Now how do you know it was Ryan Spangler?
>
> A:    Because I went to the police station and someone mentioned his name.  I went to file a police report at the police station the next day or so.
>
> Q:    And someone mentioned his name?
>
> . . .
>
> A:    They just said this is the guy that – I had told the commander, which was the lieutenant what happened at the gym and it's like they kind of stonewalled me.  Somebody happened to mention Ryan Spangler's name, that's how I knew his name.

(Pl. Dep. at 52–52).  Plaintiff testified that the officers were rough with him after he was handcuffed:

> Q:    So you were handcuffed on the third floor?
>
> A:    Yes.
>
> Q:    The police went through your pockets?
>
> A:    Yes.
>
> Q:    Where was Shila while this was going on?

5

A:     What they did after they handcuffed me is went through my pockets.  What they did is they stood me against the wall for 20 minutes and were talking to her standing there.

 . . . .

Q:     After the 20 minutes goes by, what happens next?

A:     After they finish talking to her, they took me and the two main police, Ryan Spangler and the other guy, they took me and took me to the doorway, and I said I don't go down the stairs, they said you are going down the stairs today. I said I usually ride the elevator.  They said you are going to go down the stairs today.
        They proceeded to take me down the stairs and they were jerking me back and forth.  One would pull me, the other one would pull me.  And they said you think you are a tough guy, you think you are tough guy don't you. A few times I just almost fell down the stairs the way they were pulling me.

Q:     Your hands were handcuffed in front or behind you?

A:     Behind me.

 . . . .

Q:     You said that you almost fell a few times on the stairs?

A:     Yes.

Q:     Did you fall?

A:     No, I didn't fall.  Thank God, I didn't fall.

 . . . .

Q:     So you were not physically injured in the stairwell?

A:     No, not in the stairwell.  No.

(Pl. Dep. at 53–56).  Once Plaintiff and the officers were back on the first floor, the officers walked Plaintiff to the front office.  (Pl. Dep. at 59).  Plaintiff claims the officers injured him while escorting him into the front office:

6

Q:      Then you entered the office behind the front desk, right?

A:      I didn't enter the office, they pushed me.  When I got to the office doors,
        there's a little corridor there and I stopped and they turned me sideways and
        they jammed me into the metal plate in the door with my arm.

  . . . .

A:      . . . So I stopped and they turned me this way and they pushed me into the
        metal plate and it hit my elbow, the metal plate.  It was like my body was on
        fire.  I'm like oh, and they push me over a chair.  They threw me over a chair
        and I fell on the floor and rolled over and got up.

(Pl. Dep. at 59–60).  Plaintiff further claims that when the officers threw him over the chair, he fell

to the floor and landed on his head and neck.  (Pl. Dep. at 68–69).  Plaintiff testified that he "rolled

. . . like . . . a summersault."  (Pl. Dep. at 69).

Plaintiff stated that he was able to get up off the floor on his own, and that he stayed standing

in the front office as he spoke with Nolan:

        After I got up off the floor, I said you bastards hurt my arm.  I was in pain.  And
        Chris Nolan then said – I said – he said – I said, you bastards hurt my arm.  Chris
        Nolan said I told you not to train in my gym anymore.  And he paused and then I said,
        let me call my attorney or let me go.  He said let him go and walk him out of here and
        if he comes back in my gym again, I'll have him arrested again, verbatim.

(Pl. Dep. at 69).  After his conversation with Nolan, Plaintiff states that Spangler took off the

handcuffs.  (Pl. Dep. at 70).  From there, Plaintiff states that he "walked out of the office and

Michael Simpson had my stuff in his hand and he – they walked us to the door and I left out of the

gym.  The police walked us to the door."  (Pl. Dep. at 70).

### 2)      Michael Simpson's Testimony

In December of 2010, Michael Simpson ("Simpson") was a full-time student at Wayne State

University.  (Simpson Dep., attached to Pl. Resp. at Ex. H, p.10-11).  Plaintiff is Simpson's uncle.

7

(Simpson Dep. at 10).  Simpson testified that he went to the WSU Gym about three or four times per week.  (Simpson Dep. at 11).  Simpson and Plaintiff would meet at the WSU Gym "every Tuesday and Thursday for weight training."  (Simpson Dep. at 13).

Simpson testified that he and Plaintiff were supposed to work out together on December 2, 2010, but could not do so "because of the incident."  (Simpson Dep. at 20).  Simpson testified that as he entered the WSU Gym on December 2, 2010, he first saw Plaintiff when "[h]e was on the main floor by the elevators and he was surrounded by Wayne State police."  (Simpson Dep. at 26).

> Q:    So essentially as soon as you swipe your WSU one card and got in the building, you see this?
>
> A:    Yes.

(Simpson Dep. at 26).

Simpson estimated that there were four or five officers surrounding Plaintiff.  (*Id.*).  Simpson stated that Plaintiff was not handcuffed when he first saw him, but that "they did handcuff [Plaintiff] in front of me though."  (Simpson Dep. at 27–28).  Simpson claims that when he first saw Plaintiff, Plaintiff "was getting – I guess he was getting his belongings out of the locker because they was surrounding him telling him that he's under arrest."  (Simpson Dep. at 28).  "[Plaintiff] was grabbing his computer bag out of the locker."  (Simpson Dep. at 56).  Later, Simpson answered "No" when asked if he heard "any of the officers say to your uncle you're under arrest or words to that effect." (Simpson Dep. at 71).

Simpson maintains that the officers "was like really aggressive with [Plaintiff] . . . [l]ike they was like pulling him and dragging him and . . . [t]hey had him by his arms."  (Simpson Dep. at 31–32).  Simpson testified that he saw "[Plaintiff's] elbow hit the doorway as they pushed him

through it." (Simpson Dep. at 33). Simpson stated that he could not see any more once Plaintiff was in the front office. (Simpson Dep. at 33). Simpson stated that he never saw the Defendant Officers and Plaintiff exit the front office. (Simpson Dep. at 70).

**B)   Defendants' Version of Events on December 2, 2010**

**1)   The Defendant Officers' Accounts**

On December 2, 2010 at approximately 4:35 p.m., Wayne State Public Safety officers were called to the WSU Gym on a report that someone had "asked a girl if she wanted training lessons in the restroom." (Police Report, Defs. Ex. B). Apparently, the victim was able to identify the subject to WSU Gym staff, who recognized the man as Plaintiff.

Defendant Spangler drafted the Police Report after the incident. (Police Report, Defs. Ex. B). In the Police Report, Spangler wrote:

SUBJECT:   FRANKLIN PARKER, B/M, 8-19-59 . . . .

 . . . .

ON THE ABOVE DATE I WAS DISPATCHED TO 5210 SECOND (REC CENTER). ON MY ARRIVAL I SPOKE WITH VIC MIRANDA NECHELLE DODSON WHO STATED SHE WAS APPROACHED WHILE SHE WAS ON THE TREADMILL WORKING OUT BY THE ABOVE SUBJECT. THE SUBJ ASKED VIC IF SHE WOULD BE INTERESTED IN JOINING HIS KICKBOXING CLASS IN THE LOCKER ROOM IN 30 MINUTES. THE SUBJ THEN WALKED AWAY AND THE VIC EXITED THE TREADMILL WALKING OVER TO THE FRONT DESK WHERE SHE NOTIFIED THE (PRO) DIRECTOR OF CAMPUS RECREATION (CHRISTY NOLAN) OF THE SITUATION. THE VIC WAS SHAKEN UP AND SCARED FROM THIS SITUATION. THE PRO STATED HE HAS HAD PAST PROBLEMS WITH THIS SUBJECT AND WANTED TO BAN HIM FROM 5210 SECOND (REC CENTER) FOR THE SAFETY OF EVERYONE INSIDE AND REOCCURRING PROBLEMS. THE PRO AND MYSELF TOLD THE SUBJ HE WAS NOT ALLOWED TO ENTER 5210 SECOND ANYMORE OR HE WOULD BE ARRESTED ON TRESPASSING. THE SUBJ LEFT THE SCENE WITH NO FURTHER INCIDENT. I FILLED OUT A C/T CARD FOR THE SUBJ FOR 5210 SECOND.

9

. . . .

(Police Report, Defs. Ex. B). At his deposition, Spangler testified that it was Officers Henry, Hammill and Jacobs who brought Plaintiff down to the front office from the third floor of the WSU Gym. (Spangler Dep., attached to Pl. Resp. at Ex. C, p. 26). Spangler was asked if Plaintiff was handcuffed when he and the officers came down to the office, and Spangler testified, "I don't remember, but I don't believe he was . . . I'm not certain, but I don't believe he was." (Spangler Dep. at 27). Spangler testified that he did not have any physical contact with Plaintiff. (*Id.*).

Defendant Officer Jacobs also responded to the WSU Gym on December 2, 2010. (Jacobs Dep., attached to Pl.'s Resp. at Ex. E, p. 20). Jacobs testified that he and Officer Spangler found Plaintiff on the third floor of the WSU Gym, and asked him to "come down stairs so we could speak with him." (Jacobs Dep. at 25). Jacobs testified that they escorted Plaintiff downstairs via the stairwell. (Jacobs Dep. at 27). Jacobs was asked whether he had any physical contact with Plaintiff, to which he responded, "[n]ot that I remember." (Jacobs Dep. at 27). Jacobs did not remember whether Plaintiff had any physical contact with Spangler. (*Id.*). Jacobs stated that he never pushed or shoved Plaintiff in the stairwell. (Jacobs Dep. at 28). Jacobs did not go into the front office with Plaintiff once he was downstairs. (Jacobs Dep. at 30).

Defendant Officer Hammill was a third officer who responded to the WSU Gym on December 2, 2010. (Hammill Dep., attached to Pl. Resp. at Ex. D, p. 12). Hammill testified that when he first arrived at the WSU Gym, he spoke with the approximately four other officers already on the scene. (Hammill Dep. at 15). After that, the officers split up to look for Plaintiff. (Hammill Dep. at 18). Hammill testified that when the officers encountered Plaintiff on the third floor of the WSU Gym, he was speaking with Wu, a female student. (Hammill Dep. at 18). Hammill testified

10

that all of the officers approached Plaintiff at the same time, and eventually "escorted [Plaintiff] down to the office behind the front desk." (Hammill Dep. at 20). Hammill testified that he did not believe that he or any of the other officers had any physical contact with Plaintiff as he was being escorted off of the third floor. (Hammill Dep. at 21). When asked whether Plaintiff was handcuffed, Hammill testified that he did not recall. (Hammill Dep. at 20). Hammill also did not recall whether there was any reason to have handcuffed Plaintiff during the incident. (Hammill Dep. at 20).

Hammill testified that the door to the front desk office of the WSU Gym is a "metal door" with a "metal door jamb, six feet tall, three to four feet wide" with no window in it. (Hammill Dep. at 23). Hammill testified that Plaintiff was not pushed through the office door and was not pushed in the stairwell. (Hammill Dep. at 23). Once Plaintiff was in the front office, "[h]e was seated in the chair directly across from the desk of Mr. Nolan." (Hammill Dep. at 25). After an approximately ten minute conversation with Nolan, Hammill stated that he and the other officers escorted Plaintiff out of the WSU Gym building. (Hammill Dep. at 26–27).

Defendant Officer Thomas acknowledged that she was dispatched to the WSU Gym on December 2, 2010, but does not remember the incident or anything that occurred on that day. (Thomas Dep., attached to Pl. Resp. at Ex. G, p. 17).

Defendant Officer Mahood recalls responding to the dispatch call at the WSU Gym on December 2, 2010. (Mahood Dep., attached to Pl. Resp. at Ex. F, p. 13). Mahood "remember[s] being in the lobby that day," but does not recall having any dealings with Plaintiff. (Mahood Dep. at 13). Mahood did not recall going to the third floor of the WSU Gym or having physical contact with anybody. (Mahood Dep. at 19). Mahood stated that he did not recall handcuffing anyone, but that if he had, it would have been noted on his activity sheet. (Mahood Dep. at 19).

11

2)      **WSU Gym Staff Members' Accounts**

Defendant Nolan, director of the WSU Gym, testified about the events leading up to his calling the police on December 2, 2010. Nolan testified that on that day, a woman approached WSU Gym staff crying and stating that "she was approached by a man who wanted to teach her a private lesson in the locker room." (Nolan Dep., attached to Defs. Mo. at Ex. C, pp. 26–27). The woman later identified Plaintiff as the individual who approached her. (Nolan Dep. at 30). Nolan had encountered Plaintiff on approximately three prior occasions over the span of about one year, all concerning Plaintiff's failure to follow the WSU Gym's policy prohibiting the training of personal clients in the facility. (Nolan Dep. at 15–16).

After the victim identified Plaintiff as the man who had approached her, Nolan went to the third floor and found Plaintiff talking to Wu, who is a female staff member at the WSU Gym. (Nolan Dep. at 37). Nolan "asked [Wu] to come with" him, and then "the police officer or officers approached" Plaintiff. (Nolan Dep. at 39). Nolan testified that he returned to the main floor of the WSU Gym and continued to talk with the victim about the incident. (Nolan Dep. at 42).

Soon thereafter, police officers brought Plaintiff downstairs to the office behind the WSU Gym's front desk area. Nolan was asked whether Plaintiff was handcuffed when the officers brought him into Nolan's office; Nolan replied that he did not know if Plaintiff was handcuffed or not. (Nolan Dep. at 44). Nolan testified that he talked to Plaintiff about "what was going on," and that Plaintiff said, "All I'm trying to do is train my clients." (Nolan Dep. at 44–45). Nolan claims he informed Plaintiff that the "training of clients" is prohibited, and that he intended to file code of conduct charges against Plaintiff. (Nolan Dep. at 48). Nolan also testified that he told Plaintiff that his access to the WSU Gym would be removed pending the outcome of the case, and that if Plaintiff

12

attempted to enter the WSU Gym prior to that he would be "issued a criminal trespass." (Nolan Dep. at 48).

Nolan testified that, as he was talking with Plaintiff in the front office, Plaintiff did not appear to be injured in any way and did not complain about being in pain or discomfort. (Nolan Dep. at 62–63).

Wu, who is a part-time personal trainer and group fitness instructor at the WSU Gym, states via affidavit that on December 2, 2010, she "went to the third floor of the [WSU Gym] at Mr. Parker's invitation to observe him providing kickboxing training to a woman." (Wu Aff., attached to Defs. Mo. at Ex. F, ¶ 5). Wu claims that she "observed Mr. Parker enter the office," and that "[a]t no time was Mr. Parker pushed into a wall, doorjamb, over a chair, or into any other object. He was not physically injured in any way, nor did he complain of any injury." (Wu Aff. at ¶¶ 7–8).

Plaintiff was not charged with a crime as a result of this incident. The outcome of the student code of conduct charges, if any were ultimately filed, is unclear.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1984) (quoting FED. R. CIV. P. 56(c)).

"The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact in the case." *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). "The moving party may meet its burden by showing that the nonmoving party lacks evidence to support an essential element of its case." *Barnhart v. Pickrel, Schaeffer & Ebeling*

13

*Co.*, 12 F.3d 1382, 1389 (6th Cir. 1993). The plaintiff must show more than "the mere existence of a scintilla of evidence" in support of his or her position in order to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). "The court must view the evidence, all facts, and any inferences that may permissibly be drawn from the facts in the light most favorable to the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Further, "[i]t is an error for the district court to resolve credibility issues against the nonmovant . . . ." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008). "In effect, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true . . . ." *Id.* (quoting *Ctr. for Bio–Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 820 (6th Cir. 2007)).

## ANALYSIS

In their Motion for Summary Judgment, Defendants argue that 1) Plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment, and 2) Defendants are entitled to qualified immunity on Plaintiff's excessive force, assault and battery, and gross negligence claims. (Defs. Mo. at i).

### 1)     Are Plaintiffs' Claims Against Defendants In Their Official Capacities Barred By The Eleventh Amendment?

Defendants argue that they are entitled to Eleventh Amendment immunity in their official capacities on all of Plaintiff's claims. (Defs. Mo. at 9).

Pursuant to the Eleventh Amendment to the U.S. Constitution, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another

14

State." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).  Other courts have found that the Eleventh

Amendment  bars suits against university police officers in their official capacities.  *Dugan v.*

*Brooks*, 818 F.2d 513, 518 n. 3 (6th Cir. 1987) (citing *Hall v. Medical College of Ohio*, 742 F.2d

299, 307 (6th Cir. 1984)).  Following this principle, this Court has previously held that the Eleventh

Amendment "bars suit against a University of Michigan police officer in his official capacity."

*Sullivan v. Regents of the University of Michigan*, 2009 WL 2915787 at *6 (E.D. Mich. 2009) (Cox,

J.).

Plaintiff agrees that his official capacity claims are barred by the Eleventh Amendment.  (Pl.

Resp. at 23).  Thus, the Court shall GRANT Defendants' motion for summary judgment on all of

Plaintiff's claims against Defendants in their official capacities.

**2)      Are Defendants Entitled To Qualified Immunity In Their Individual Capacities On Plaintiff's Excessive Force Claim?**

Defendants argue that they are entitled to qualified immunity on Plaintiff's claims of

excessive force against them in their individual capacities.

"Under the doctrine of qualified immunity, government officials, including police officers,

will not be held liable on a plaintiff's claim for civil damages so long as their conduct does not

violate clearly established statutory or constitutional rights which the reasonable officer in the

defendants' position would have known."  *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir.

2001); *see also Schreiber v. Moe*, 596 F.3d 323, 329 (6th Cir. 2010); *see also Thomas v. Cohen*, 304

F.3d 563, 568 ("[G]overnment actors, including police officers, have the freedom to perform their

official duties without fear that even a slight misstep will trigger their financial ruin.").

"Determining whether government officials are entitled to qualified immunity generally requires two

inquiries: 'First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation occurred? Second, was the right clearly established at the time of the violation?'" *Schreiber*, 596 F.3d at 329 (quoting *Phillips v. Roane County*, 534 F.3d 531, 538–39 (6th Cir. 2008)).

Plaintiff "bears the burden of showing that defendants are not entitled to qualified immunity." *Chappell v. City Of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (citing *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005)). "The issue of qualified immunity may be submitted to a jury only if 'the legal question of immunity is completely dependent upon which view of the [disputed] facts is accepted by the jury.'" *Miller*, 606 F.3d at 247 (quoting *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007)). "When making a qualified immunity analysis, it is important to remember that the defendant is, in essence, saying: 'If the plaintiff's version is credited, what I did, judged *today*, *arguendo* would be wrongful, but at the time I acted, no reasonable officer would have known he was acting wrongfully.'" *Kostrzewa*, 247 F.3d at 641 (quoting *Kain v. Nesbitt*, 156 F.3d 669, 671 (6th Cir.1998)).

Defendants argue that they are entitled to qualified immunity on Plaintiff's excessive force claim.[2] In the excessive force context, the second prong of qualified immunity analysis—whether the right is clearly established—is easily resolved; the Sixth Circuit has held that the right to be free from excessive force is a clearly established right for purposes of the qualified immunity analysis. *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001); *see also Harris v. City of Circleville*,

---

[2]An officer's entitlement to qualified immunity depends, in part, on his or her own actions. Although the parties do not address each Defendant's claim for qualified immunity separately, the Court will do so here. *Binay v. Bettendorf*, 601 F.3d 640, 652 (6th Cir. 2010) ("Each defendant's liability must be assessed individually based on his own actions.").

16

583 F.3d 356, 367 (6th Cir. 2009) ("Under this circuit's existing case law, there undoubtedly is a clearly established legal norm precluding the use of violent physical force against a criminal suspect who already has been subdued and does not present a danger to himself or others.").

The question then becomes whether Defendants violated Plaintiff's right to be free from excessive force and, if so, whether Defendants knew they were doing so. "The question of whether the reasonable officer would have known his conduct violated clearly established constitutional rights can be answered by the initial inquiry of whether the officer's use of force was objectively reasonable." *Kostrzewa*, 247 F.3d at 641. Thus, whether Defendants are entitled to qualified immunity on the excessive force claim depends on whether the officer used excessive force, i.e. whether the officer's use of force was objectively reasonable. *Id.* (citing *Martin v. Heideman*, 106 F.3d 1308, 1312-13 (6th Cir. 1997)); *see also Cohen*, 304 F.3d at 569 ("Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action.") (internal quotation marks and citation omitted).

### i.    Christy Nolan

Defendant Nolan is the Director of the WSU Gym. According to Plaintiff, Nolan did not participate in Plaintiff's alleged arrest and was not present to witness the Defendant Officers walking Plaintiff down the stairs. Plaintiff testified that Nolan was already in the front office when Defendant Officers allegedly pushed Plaintiff into the door jamb of the front office door and then into the front office.

Even assuming Plaintiff's account is true, the Court finds that Plaintiff has no evidence to establish that Nolan used excessive force during their encounter. Nor does Plaintiff claim that Nolan

was in a position to witness the majority of the Officers' actions such that Nolan should have intervened. Because Plaintiff has no evidence showing that Nolan violated Plaintiff's Fourth Amendment rights, Nolan is entitled to qualified immunity. Accordingly, the Court shall GRANT summary judgment to Nolan on Plaintiff's § 1983 excessive force claim.

### ii.     Officer Ryan Spangler

Plaintiff testified that Officer Spangler "was the lead person" who told him that he was under arrest, and that "he was the person that was jerking [Plaintiff] around." (Pl. Dep. at 52–53). According to Plaintiff, Spangler was "really rough and really mean." (Pl. Dep. at 53).

Plaintiff testified that Spangler and another unknown officer handcuffed him, pushed and pulled him down the stairs, pushed him into the metal door jamb of the front office door and then pushed him into the front office, causing him to flip over a chair.

Defendants do not necessarily have any evidence directly disputing Plaintiff's claim that he was handcuffed; many of the officers testified that they could not recall whether Plaintiff was handcuffed or not. Nevertheless, all Defendants, including Spangler, maintain that they did not push and/or pull Plaintiff down the stairs, and did not push Plaintiff into the door jamb or into the front office. Spangler appears to dispute Plaintiff's assertion that he was one of the officers who encountered Plaintiff on the third floor of the WSU Gym, (Spangler Dep., Pl. Ex. C at 26), although Officer Jacobs testified that Spangler went with him to the third floor. (Jacobs Dep. at 25).

The Court finds that, based on the conflicting testimony of Plaintiff versus the Defendant Officers, there is a genuine issue of material fact as to whether Officer Spangler used excessive force in his encounter with Plaintiff. There is a genuine dispute as to whether Plaintiff was handcuffed.

Accordingly, because there are genuine issues of fact regarding whether Spangler had contact

18

with Plaintiff and whether Spangler used excessive force during that encounter, the Court shall DENY qualified immunity to Spangler on Plaintiff's § 1983 excessive force claim.

### iii.       Officers Jacobs, Hammill, Mahood and Thomas

Plaintiff could not identify the other officer he claims was physically forceful with him during the incident. However, all four remaining Defendant Officers admit that they responded to the WSU Gym call on December 2, 2010. Plaintiff asserts that the remaining officers can be held liable for excessive force under a "failure to intervene" theory. (Pl. Resp. at 29).

"A police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Kowolonek v. Moore*, 463 Fed. App'x 531, 539 (6th Cir. 2012).

The Court shall grant Defendants' Jacobs, Hammill, Mahood and Thomas motion for summary judgment on the excessive force claim because Plaintiff has not shown that any of them knew excessive force would be used *or* that they had the opportunity and means to prevent it. Plaintiff's excessive force claim centers around him being pushed into the door jamb of the front office door and thrown over a chair. Even assuming this actually happened, and further assuming these four officers witnessed it, it would have occurred in such a short amount of time that it is highly unlikely these officers could have done to prevent it. *See Ontha v. Rutherford Cty., Tenn.*, 222 Fed. App'x 498, 505–06 (6th Cir. 2007) (finding that defendant could not be held liable for failing to intervene when window of opportunity to act was only six or seven seconds). Because the Court ultimately concludes that Plaintiff has no evidence showing that these Defendant Officers had a duty or opportunity to intervene, the Court shall GRANT summary judgment on Plaintiff's

19

excessive force claim to Jacobs, Hammill, Mahood, and Thomas.

**3)   Are Defendants Entitled to Governmental Immunity on Plaintiff's Assault and Battery and Gross Negligence Claims?**

In their Motion for Summary Judgment, Defendants state in the section headings that they are "entitled to qualified immunity in their individual capacity on Plaintiff's claim of assault and battery under Michigan law" as well as "Plaintiff's claim of gross negligence under Michigan law." (Defs. Mo. at i).

Governmental immunity (or statutory qualified immunity under Michigan law) typically does not extend to intentional torts such as assault and battery. *See Sudal v. City of Hamtramck*, 221 Mich. App. 455, 458 (1997); *Wrack v. City of Detroit*, 2007 WL 2121995, at *4 (E.D. Mich. July 24, 2007). "However, the law allows police officers to use some force in the exercise of their duties without liability for assault and battery." *Sullivan*, 2009 WL 2915787 at *12 (quoting *Meyer v. Woodward*, 617 F. Supp. 2d 554 (E.D. Mich. 2008)). The controlling case setting forth the test for governmental immunity for intentional torts under Michigan law is *Odom v. Wayne County*, 482 Mich. 459 (2008).

> In *Odom* . . . . the Michigan Supreme Court stated that the proper method for determining whether governmental immunity applies to intentional torts, such as assault and battery, is to apply the test set forth in *Ross v. Consumers Power Co.*, 420 Mich. 567, 363 N.W.2d 641, 647 (1984). Under the *Ross* test, an employee enjoys a right to immunity if (1) the employee undertook the challenged acts during the course of his employment and was acting, or reasonably believed that he was acting, within the scope of his authority; (2) the employee undertook the challenged acts in good faith or without malice; and (3) the acts were discretionary, rather than ministerial, in nature. *Odom*, 760 N.W.2d at 228. Defendants bear the burden of establishing their entitlement to immunity from plaintiff's state-law claims. *Id.* at 227–28.

*Bletz*, 641 F.3d at 757.

20

A)      **Assault and Battery Claim**

The Court finds that Nolan, Jacobs, Hammill, Mahood, and Thomas are entitled to summary judgment on Plaintiff's assault and battery claim.  Plaintiff has no evidence that these particular Defendants committed assault and battery against him.

However, for the reasons set forth in the analysis concerning Qualified Immunity, *supra*, the Court finds that there is a genuine issue of material fact as to whether Spangler acted with good faith and without malice in his dealings with Plaintiff.  If the jury concludes that Spangler indeed pushed Plaintiff into the door jamb and threw him over a chair, the jury could reasonably infer that Spangler acted without good faith.

Therefore, the Court shall GRANT summary judgment on Plaintiff's assault and battery claim to Nolan, Jacobs, Hammill, Mahood and Thomas, but DENY the same to Spangler.

B)      **Gross Negligence Claim**

Count Five of Plaintiff's Amended Complaint alleges that "[t]he conduct of Defendants amounted to gross negligence that was the proximate cause of Plaintiff's injuries and damages." (Amd. Compl. at ¶ 57).  "Gross negligence is defined by statute as 'conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.'"  *Maiden v. Rozwood*, 461 Mich. 109, 122 (1999) (*quoting* MCL 691.1407(2)(c)).

Gross negligence is an exception to governmental immunity under Michigan law.  M.C.L. § 691.1407(2)(c).  In other words, a government employee is not entitled to governmental immunity if he or she is found to have acted with gross negligence in the performance of his or her duties. Case law makes clear, however, that gross negligence is not an independent cause of action.  *Bletz*, 641 F.3d at 756 (citing *VanVorous*, 687 N.W.2d at 143, and *Livermore v. Lubelan*, 476 F.3d 397,

21

408 (6th Cir. 2007)). "Michigan 'has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence.'" *Miller*, 606 F.3d at 254 (quoting *VanVorous*, 686 N.W.2d at 143).

Here, Plaintiff's factual averments are all aimed at establishing that Defendants committed intentional torts, and intentionally used excessive force, during their encounter at the WSU Gym. On these facts, Plaintiff cannot re-plead his intentional tort claims as a gross negligence claim. The Court shall GRANT summary judgment to all Defendants on Plaintiff's gross negligence claim. *See Miller*, 606 F.3d at 254 (finding that plaintiff failed to state a claim for gross negligence upon which relief may be granted under Michigan law, and affirming district court's grant of summary judgment to defendant on this claim).

**4)   All Defendants, Except Spangler, Are Entitled To Summary Judgment On Plaintiff's Claim For False Arrest/False Imprisonment (Count III). All Defendants Are Entitled To Summary Judgment on Plaintiff's Claim for § 1983 Illegal Search And Seizure (Count Four).**

Under Michigan law, to establish a prima facie case of false arrest, Plaintiff must show that "defendant either arrested the plaintiff, or instigated his arrest . . . ." and the arrest was made without probable cause or is otherwise unlawful. *Lewis v. Farmer Jack Div., Inc.*, 415 Mich. 212, 250 (1982). At oral argument on this motion, Plaintiff's counsel stated that it can be inferred from Plaintiff's testimony that Officer Spangler arrested Plaintiff, but admits that he has no other evidence that any other Defendant Officer was involved in the arrest. Therefore, summary judgment as to all Defendants except Spangler on Plaintiff's False Arrest/False Imprisonment claim is proper.

In order for any of the Defendant Officers to be held liable for a violation of Plaintiff's constitutional rights under § 1983, "personal involvement must be shown." *Bruner v. Dunaway*, 684

22

F.2d 422, 425 (6th Cir. 1982); *see also Hassen v. City of Taylor*, 2007 WL 4465232, at *5 (E.D. Mich. 2007) (Cohn, J.).  Plaintiff's counsel also admitted at oral argument that Plaintiff has no evidence establishing which of the Defendant Officers detained and searched him.  Therefore, the Court concludes that summary judgment in all Defendants' favor is warranted on Plaintiff's § 1983 Illegal Search and Seizure claim.  *See Reyes v. City of Pontiac*, 2009 WL 2877033 at *3 (E.D. Mich. 2009) (holding that Plaintiff's excessive force claims against Defendants fail because "Plaintiff could not identify any individual Defendant Officer as the alleged assailant . . . ."); *Hassen*, 2007 WL 4465232 at *5 (granting summary judgment to group of police officers because the plaintiff could not identify which one of them beat him or show that any of them were personally involved in the wrongdoing).

## CONCLUSION

Based on the foregoing, the Court shall GRANT IN PART and DENY IN PART Defendants' Motion for Summary Judgment (Doc. #19).  The Court denies summary judgment to Defendant Spangler, in his individual capacity only, on Count One of Plaintiff's Complaint (§ 1983 Excessive Force), Count Two (Assault and Battery), and Count Three (False Arrest/False Imprisonment), but grants summary judgment to Defendants in all other respects.

**IT IS SO ORDERED.**

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  August 11, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on

23

August 11, 2015, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager

24